REVISED - August 5, 1999

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 97-31057
_____

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee-Cross-Appellant,

v.

LARRY S. BANKSTON; MARIA F. GOODSON,

                    Defendants-Appellants-Cross-Appellees

CARL W. CLEVELAND; FRED H. GOODSON,

                    Defendants-Appellants.

_____
                  _____

                         No. 98-30471
                  _____

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

v.

MARIA F. GOODSON,

                    Defendant-Appellant.

ALEXANDROS F. GOODSON; TRUCK STOP GAMING LTD.,

                    Intervenors-Appellants.

_____

        Appeals from the United States District Court
             for the Eastern District of Louisiana
_____
                      July 21, 1999

Before KING, Chief Judge, and REAVLEY and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Larry Bankston ("Bankston"), Fred Goodson, Maria Goodson, and Carl Cleveland ("Cleveland") appeal from their June 27, 1997, convictions and October 15, 1997, sentences for various offenses related to criminal activity in the Louisiana video poker industry. Fred Goodson and Cleveland, along with Alex Goodson, Maria Goodson, and Truck Stop Gaming, Inc. ("TSG, Inc."), additionally appeal the district court's judgment of forfeiture of Truck Stop Gaming, Ltd. ("TSG, Ltd.") and TSG, Inc. as part of the RICO enterprise. The Government cross-appeals, challenging the district court's calculation of both Bankston's and Maria Goodson's sentences. For the reasons set forth below, we affirm the Appellants' convictions and sentences and the forfeiture of TSG, Ltd. and TSG, Inc.

## I. BACKGROUND

Fred Goodson and his family had been in the truck stop business in Slidell, Louisiana for 20 years. In early 1992, the Goodson family formed TSG, Ltd. and its corporate partner, TSG, Inc., in order to participate in the video poker business at their Slidell truck stop. Fred Goodson and Carl Cleveland's law firm, Cleveland, Barrios, Kingsdorf & Casteix ("CBK&C"), loaned Goodson's adult children, Alex and Maria, the start-up capital for TSG, Ltd.[1] With the legal assistance of CBK&C, a

---

[1]Those loans were secured by promissory notes, payable on demand, with 10% annual interest.

partnership in commendam was established.  Alex and Maria each owned 49% of TSG, Ltd. as limited partners.[2]  TSG, Inc. owned the remaining 2% as general partner.[3]  Fred Goodson managed TSG, Ltd.

CBK&C also helped the Goodsons prepare and submit to the Louisiana State Police applications for an owner/operator's gaming license for TSG, Ltd.  The gaming applications required partnerships seeking a license to identify their partners, to submit personal financial statements for all partners, and to affirm that the listed partners were the sole beneficial owners, that no partner had an arrangement to hold his interest as "an agent, nominee or otherwise," or a present intention to transfer any interest in the partnership at a future time.  The initial application submitted on behalf of TSG, Ltd. identified Maria and Alex Goodson as the limited partners and TSG, Inc. as the general partner.  The application listed no other persons or entities as having any ownership interest in TSG, Ltd.  The initial license application did disclose, however, that Fred Goodson and CBK&C had loaned Maria and Alex all initial capital.  That same application also identified Fred Goodson as general manager of the business.  TSG, Ltd. submitted renewal applications in 1993, 1994, and 1995, which also listed no additional ownership interests.[4]

---

[2]TSG, Ltd.'s Agreement of Partnership was signed by Alex and Maria and filed with the Louisiana Secretary of State.

[3]Alex and Maria owned equal shares of TSG, Inc.

[4]In August 1994, Maria Goodson executed a "Sale of Partnership Interest and Pledge

In 1994, as a part of an unrelated federal investigation of alleged corruption involving Louisiana legislators, the F.B.I. obtained court authorization to conduct electronic surveillance of the office of Louisiana State Senator Larry Bankston. The authorization was based on a series of consensually recorded conversations that took place in September and October 1994 between Bankston and Robert Miller, a cooperating witness. According to the FBI, the Bankston-Miller conversations indicated that Bankston was engaged in a scheme to extort an interest in a casino proposed by the Jena Choctaw tribe, in exchange for his influence in ensuring government approval of the casino.

During the course of its electronic surveillance--limited to the interception of communications concerning the alleged Jena Choctaw scheme--the FBI recorded a conversation between Bankston and Fred Goodson. In that conversation, the two men discussed, in detail, Goodson's truck stop business. Neither man mentioned the Jena Choctaw scheme. Approximately 20 minutes into their discussion, Goodson broached the subject that would form the basis for the present multi-party, multi-count indictment. Armed with the recording of Bankston and Goodson's 44-minute conversation, the FBI obtained court authorization for electronic surveillance on Goodson's home and businesses.

On October 4, 1996, the Government charged now former Louisiana State Senators Benjamin "Sixty" Rayburn and Larry

---

Agreement," which conveyed to Benny Rayburn, the adult son of co-defendant Benjamin "Sixty" Rayburn, a 4.99% interest in TSG, Ltd. Rayburn's 4.99% interest was not disclosed in any renewal application.

4

Bankston; video poker entrepreneur Fred Goodson; his daughter, Maria Goodson; family attorney, Carl Cleveland; and the family's accountant, Joe Morgan, with a combination of racketeering, racketeering conspiracy, mail fraud, conducting an illegal gambling business, money laundering, tax conspiracy, false declaration under penalty of perjury, aiding and abetting a false declaration under penalty of perjury, and interstate communications in aid of racketeering.[5]  Most of the charges against the Goodsons, Cleveland, and Joe Morgan related to the establishment, licensing, and operation of TSG, Ltd.  The Government alleged that the defendants had schemed to defraud state regulators in obtaining video poker licenses for TSG, Ltd., and to obtain favorable legislation affecting Louisiana's video poker industry.  Specifically, the Government alleged that the defendants obtained a gaming license for TSG, Ltd. in 1992 and renewed in 1993, 1994, and 1995, by fraudulently concealing the identity of the true owners of the company, Fred Goodson and Carl Cleveland.[6]  According to the Government, Goodson and Cleveland concealed their ownership in order to avoid the probing inquiry of the State's suitability assessment.

---

[5]The Government did not indict Fred Goodson's son, Alex Goodson, but subsequently named him an unindicted co-conspirator. Alex Goodson joins the instant action as an intervenor in the forfeiture proceedings.

[6]Alex and Maria Goodson were from inception and remain the record owners of TSG, Ltd. and its corporate general partner, TSG, Inc.

Trial commenced on May 12, 1997, and lasted six weeks. Following more than seven days of deliberation, the jury returned a mixed verdict, finding four of the defendants--Carl Cleveland, Fred Goodson, Maria Goodson, and Larry Bankston--guilty of certain counts.[7] The jury acquitted the remaining two defendants--Senator Rayburn and Joe Morgan--on all counts.

On October 15, 1997, The district court sentenced the four convicted defendants. Both Cleveland and Fred Goodson received terms of imprisonment of 121 months. Maria Goodson received a six-month term of imprisonment to be followed by six months of home detention. Bankston received a 41-month term of imprisonment and a fine of $20,000.

The defendants filed timely notices of appeal as to their convictions and sentences. On November 14, 1997, the Government filed a notice of cross-appeal relating to the sentences of Bankston and Maria Goodson.

Following Fred Goodson's and Carl Cleveland's convictions for RICO and RICO conspiracy, the Government sought forfeiture of, _inter alia_, their alleged interests in TSG, Ltd. and TSG,

---

[7]Cleveland was convicted on one count of RICO, one count of RICO conspiracy, two counts of mail fraud (in connection with the 1994 and 1995 TSG, Ltd. gaming license renewal applications), four counts of money laundering, one count of tax conspiracy, and one count of aiding and abetting the filing of a false tax return. Like Cleveland, Fred Goodson was convicted of one count of RICO, one count of RICO conspiracy, and two counts of mail fraud (in connection with the 1994 and 1995 TSG, Ltd. gaming license renewal applications). The jury additionally convicted Goodson of five counts of money laundering and three counts of the use of interstate communications in aid of state bribery. His daughter, Maria, was found guilty of one count of mail fraud in connection with TSG, Ltd.'s 1995 license renewal application. Former Senator Bankston was found guilty of two counts of committing and/or aiding and abetting interstate communications in aid of racketeering.

6

Inc.  On August 26, 1997, the district court entered a judgment ordering the forfeiture of TSG, Ltd. and TSG, Inc.  The district court noted that the jury's verdict and the evidence in the criminal trial record proved beyond a reasonable doubt that Goodson and Cleveland had an interest in TSG, Ltd. and TSG, Inc. and that those entities were part of the RICO enterprise.  On October 21, 1997, The district court entered the final order of forfeiture.

On October 31, 1997, Alex and Maria Goodson, as record owners of TSG, Ltd. and TSG, Inc., filed separate petitions of intervention in the forfeiture proceedings, asserting their ownership interests in the two companies.  On February 4, 1998, the district court conducted an evidentiary hearing on their petitions, and on April 15, 1998, the district court denied their claims.  The district court ruled that Fred Goodson and Carl Cleveland were the "true owners" of TSG, Ltd. and TSG, Inc. and that their ownership interests had been properly forfeited to the Government.  Alex and Maria Goodson and TSG, Inc. appeal from that ruling.

## II.  DISCUSSION

### A.  Wiretap Evidence

#### 1.  Application Omissions

Fred Goodson and Larry Bankston argue that the district court erred in refusing to suppress the evidence obtained from the Bankston wiretap.  Both appellants additionally argue that the district court erred in denying their request for an

7

evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S. Ct. 2674 (1978).

Before trial, Bankston filed a motion to suppress the wiretap evidence. Fred Goodson, Maria Goodson, and Carl Cleveland joined the motion.[8] Bankston contended that the November 25, 1994, affidavit completed by Agent Jones in support of the wiretap application contained fatal omissions and misrepresentations. His motion described an "exculpatory" conversation between Bankston and Miller that had been omitted from the wiretap application and claimed that the FBI told Miller to stop recording after that conversation. Bankston asserted that the false statements and/or omissions were deliberately or recklessly made. He accompanied his motion with an offer of proof including affidavits and sworn testimony.

The district court, after hearing arguments by counsel and reviewing submissions, denied Bankston's request for a <u>Franks</u> evidentiary hearing. The court found that Bankston had failed to make the requisite showing that the affiant, Agent Jones, had intentionally misled the District Court and tricked the Court into issuing the wiretap authorization and that the omissions were material such that they negated probable cause.

---

[8]On appeal, Maria Goodson and Carl Cleveland cross-incorporate Fred Goodson and Bankston's suppression arguments. However, neither Maria nor Cleveland meets our standing requirements as articulated in <u>United States v. Scasino</u>, 513 F.2d 47 (5th Cir. 1975). Because we conclude that the district court did not err in admitting the wiretap evidence, we need not consider Cleveland's argument that he has standing despite <u>Scasino</u>.

We review de novo the denial of a <u>Franks v. Delaware</u> evidentiary hearing. <u>See</u> <u>United States v. Dickey</u>, 102 F.3d 157, 162 (5th Cir. 1996) (reviewing the denial of a <u>Franks</u> hearing in the context of a search warrant); <u>United States v. Guerra-Marez</u>, 928 F.2d 665, 671 (5th Cir. 1991) (applying the <u>Franks</u> standard and reviewing de novo the decision of the district court to validate a wiretap order). In <u>Franks v. Delaware</u>, the Supreme Court held that a defendant is entitled to an evidentiary hearing to contest the validity of a search warrant if he makes a substantial preliminary showing that (1) allegations in a supporting affidavit were a deliberate falsehood or made with a reckless disregard for the truth and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause. <u>See</u> <u>Franks</u>, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978). We have explained that "even if the defendant makes a showing of deliberate falsity or reckless disregard for the truth by law enforcement officers, he is not entitled to a hearing if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." <u>United States v. Privette</u>, 947 F.2d 1259, 1261 (5th Cir. 1991) (quoting <u>Franks</u>, 438 U.S. at 171-72, 98 S. Ct. at 2684-85)).

We have applied <u>Franks</u> to instances of omission where, as here, an affidavit falls squarely within the dictates of 18 U.S.C. § 2518. <u>United States v. Tomblin</u>, 46 F.3d 1369, 1377 (5th

Cir. 1995) (noting that "[o]missions or misrepresentations can constitute improper government behavior"). In such cases of omitted information, the logic of Privette holds firm: a defendant is not entitled to an evidentiary hearing if a wiretap authorization would lawfully have issued after correcting the supporting affidavit by supplying any material omissions. Therefore, in determining whether Fred Goodson and Bankston were improperly denied an evidentiary hearing on their motion to suppress, we need only consider Agent Jones's affidavit-- corrected to contain the allegedly exculpatory conversation--and determine whether that reconstructed affidavit satisfies the wiretap requirements contained in 18 U.S.C. § 2518.

If the Jones affidavit were revised to include the omitted information, the affidavit would describe conversations suggesting that between September 19 and October 31, 1994, the cooperating witness, Miller, and Bankston had discussed a scheme to exchange Bankston's influence for an ownership interest in the Jena Choctaw casino. In particular, the affidavit would reveal that Bankston had met with Jena Choctaw Chief Jackson several times, had agreed to provide the Jena Choctaw tribe with "political cover," and had been telephoned frequently by Chief Jackson. The affidavit would also state that, in a sixth conversation with Miller on October 31, 1994, Bankston had declared that he was "fini" and that his present intention was "to stay away from . . . this entire thing." The affidavit would additionally include statements made by Bankston to Miller at the

conclusion of that October 31, 1994, conversation expressing Bankston's "willing[ness] to proceed" with the project if "something could be worked out to his satisfaction."

### a. Probable Cause

An application for a wiretap must demonstrate probable cause to believe that the target has committed, is committing, or will commit a crime, as well as "probable cause for belief that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a)-(b). We evaluate probable cause utilizing a totality-of-the-circumstances test. See Dickey, 102 F.3d at 162. In light of Miller's multiple statements to the FBI that Bankston was negotiating a deal in which he would extort an undisclosed interest in the Jena Choctaw casino, the multiple taped conversations containing statements that corroborated this tip from Miller, and the ambiguity of any exculpatory statements in the October 31 conversation, we find that the reconstructed affidavit would establish sufficient probable cause to authorize electronic surveillance on November 25.[9]

### b. Necessity

---

[9]Our finding of probable cause includes a finding that "particular communications" concerning that offense would have been "obtained through such interception." See 18 U.S.C. § 2518(3)(b). The October 31, 1994, conversation between Miller and Bankston in no way undermines probable cause to believe that Bankston would have committed the Jena Choctaw scheme and that particular communications concerning the scheme would occur either in Bankston's office or on his phone.

11

Bankston and Goodson also argue that the application failed to meet the dictates of 18 U.S.C. § 2518(3)(c), which requires the Government to show and the issuing judge to find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). The Government "need not prove exhaustion of every conceivable option before a wiretap order may issue." Guerra-Marez, 928 F.2d at 671.

Here, the FBI included in its 21-page wiretap application a detailed account of the investigative techniques it had employed in making its case against Bankston. Agent Jones stated in his November 25, 1994, affidavit that the use of electronic surveillance was necessary because Bankston had made it clear to Miller that he would not include him in any potentially incriminating conversations with third parties.[10]

We have affirmed wiretap orders based upon similar affidavits. See, e.g., United States v. Krout, 66 F.3d 1420, 1425 (5th Cir. 1995) (explaining that the informants or undercover agents could not infiltrate the conspiracy at high enough levels); United States v. Collins, 972 F.2d 1385, 1412 (5th Cir. 1992) (noting that consensual monitoring would be impossible, as it was unlikely that the informant would be present during the illegal activity). Agent Jones's affidavit

_____

[10]In his talks with Miller, Bankston had alluded to conversations that he would be having with his stockholder nominee as well as other people in Louisiana whom he had to satisfy out of his five-percent hidden ownership interest in the Jena Choctaw casino.

12

provides sufficient information to meet the requirements of § 2518(3)(c). The omission of the October 31 conversation does not impact our finding of "necessity," nor does the fact that the FBI failed to inform the issuing court that Miller had been told to cease recording his conversations with Bankston. Regardless of whether Miller continued to record his conversations with Bankston, Miller was unlikely to be present during the talks between Bankston and his Louisiana contacts. Therefore, a need for electronic surveillance existed.

## 2. Minimization

Bankston and Fred Goodson contest the district court's factual finding that the FBI properly minimized the interception of communications outside the scope of the wiretap order. In particular, Bankston and Goodson dispute the interception of their December 1994 conversation, which included no mention of the Jena Choctaw tribe casino scheme and did not broach the subject of criminal activity until approximately twenty minutes into the conversation. We review determinations of the reasonableness of minimization efforts for clear error. See United States v. Wilson, 77 F.3d 105, 112 (5th Cir. 1996).

Section 2518 implements "the constitutional mandate . . . that wiretapping must be conducted with particularity," United States v. Daly, 535 F.2d 434, 440 (8th Cir. 1976) (citation omitted), by requiring electronic surveillance to "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5).

13

The Government's efforts to minimize nonrelevant conversations must be "objectively reasonable" in light of the circumstances confronting the interceptor.  Scott v. United States, 436 U.S. 128, 136-143, 98 S. Ct. 1717, 1723-27 (1978); see also United States v. Hyde, 574 F.2d 856, 869 (5th Cir. 1978) (explaining that the minimization standard applies a test of reasonableness to the particular facts of each case) (citing Daly, 535 F.2d at 441).  Neither the Fourth Amendment nor 18 U.S.C. § 2515, however, requires government agents to avoid intercepting all nonrelevant conversations when conducting a wiretap investigation.  See Scott, 436 U.S. at 137-140, 98 S. Ct. 1723-24.

We consider three factors in deciding the objective reasonableness of efforts to minimize: (1) the "nature and scope of the criminal enterprise under investigation;" (2) the "Government's reasonable inferences of the character of a conversation from the parties to it;" and (3) the "extent of judicial supervision."  Hyde, 574 F.2d at 869.  Here, consistent with our precedent, the district court found that the FBI's efforts to minimize were reasonable in light of the fact that (1) the criminal investigation involved "a potentially wide-ranging conspiracy in which the coconspirators had not been identified;" (2) Goodson reported to Bankston "specific details of Goodson's truck stop business that one would not normally provide to one who was not a participant in the endeavor;" and (3) the issuing court had determined, based on regularly submitted ten-day

14

reports, including the results of interceptions, that the Government was acting in a proper manner.

Bankston reurges statistical analyses he presented to the district court to question the Government's minimization efforts. Bankston's reliance on statistics is unpersuasive. First, the district court rightly pointed out that Bankston's statistics, even if taken as accurate, showed minimization efforts that were reasonable. Second, the Supreme Court has discouraged the use of statistics, explaining that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." Scott, 436 U.S. at 140, 98 S. Ct. at 1724.

Goodson argues that the criminal nature of the December 1994 conversation could not have been immediately apparent because the subject of criminal activity was not broached until approximately twenty minutes into the conversation and that, by this point, agents should have already ceased monitoring the conversation. Goodson analogizes an agent's monitoring of communications concerning crimes not the subject of a wiretap order to an officer's seizure of contraband pursuant to the plain view doctrine. Goodson cites United States v. Johnson, 539 F.2d 181 (D.C. Cir. 1976), in support of his novel plain view analogy. In particular, Goodson points to the following language from Johnson: "Like an officer who sees contraband in plain view from a vantage point where he has a right to be, one properly overhearing unexpected villainy need not ignore such evidence." See id. at 188. Goodson then attempts to graft onto the Scott

15

objective reasonableness inquiry the plain view doctrine's probable cause requirement.  He urges us to find that an agent monitoring "windfall" communications must, at the time of the monitoring, have probable cause to believe that the communication concerns criminal activity.

Caselaw does not support such a probable cause requirement. We are unaware of any case in which an appellate court employed a probable cause analysis to determine whether to suppress non-minimized, "other criminal activity" communications.  Moreover, requiring probable cause that a windfall communication itself concerns criminal activity is inconsistent with the objective reasonableness inquiry.  Adding a probable cause analysis would require that monitoring agents be more than reasonable in their efforts to minimize.  Goodson's approach would require that agents be gifted with "prescience" and the ability to "'know in advance what direction the conversation will take.'"  United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972) (quoting United States v. LaGorga, 336 F.Supp. 190, 196 (W.D. Penn. 1971)).  Consistent with Scott, we conclude that the district court did not commit clear error in determining that the FBI's minimization efforts were objectively reasonable.

## B.  Choice of Counsel

Fred Goodson argues that the district court erred in denying, on grounds of conflict, his motion to associate Michael

Fawer as additional counsel.[11]  Goodson complains that the district court's ruling constitutes error in light of both his and Rayburn's knowing waiver of any conflict of interest and the sworn statements averring unawareness of any actual or potential conflict of interest submitted by Michele Fournet (counsel for Goodson), Michael Fawer, and Arthur Lemann.

We review a district court's finding of a conflict of interest for abuse of discretion.  See United States v. Sotelo, 97 F.3d 782, 791 (5th Cir. 1996).  Although a district court must "recognize a presumption in favor of petitioner's counsel of choice," "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict."  Wheat v. United States, 486 U.S. 153, 164, 108 S. Ct. 1692, 1700 (1988).  This is true even where a defendant expresses a desire to waive the potential conflict.  See Sotelo, 97 F.3d at 791.

The crux of Goodson's argument is that the district court's veto of his choice of counsel without finding any "special circumstances" beyond the fact of multiple representation amounts to a per se rule that multiple representation would never be permissible.  Goodson contends that such a per se rule

---

[11]Michael Fawer represented Goodson's co-defendant, former Louisiana State Senator Rayburn, through the investigative stage of this case.  Fawer assisted Rayburn in responding to three grand jury subpoenas, had discussions with the Government regarding the nature of the charges being considered against Rayburn, and appeared in court on behalf of Rayburn at the initial appearance, as well as later to argue motions.

On November 5, 1996, Fawer withdrew as counsel for Rayburn, and Arthur A. Lemann, III replaced Fawer as counsel for Rayburn.  On February 24, 1997, Goodson moved the district court to associate Fawer as additional counsel for him.

17

contravenes Supreme Court and Fifth Circuit precedent that has recognized the advantages of common defenses. Goodson additionally argues that the four potential areas of conflict elucidated by the district court exist in every case of multiple representation and that appellate courts have regularly found that conflicts do not arise in those contexts.[12]

Goodson's argument is flawed. First, the district court in no way established a per se rule against joint representation. The district court applied the Sixth Amendment and the Supreme Court's Wheat analysis to the facts developed at the hearing before the magistrate judge. On the basis of those facts, The district court concluded that institutional interests and interests of the defendant warranted a denial of Goodson's motion to associate Fawer. Second, neither the Supreme Court nor this Circuit has adopted a "special circumstances" test for determinations of conflict in joint representation. Although the Supreme Court's 1980 Cuyler decision does include "special circumstances" language, it does so only in discussing when a state court, sua sponte, needs to "initiate inquiries into the propriety of multiple representation." Cuyler v. Sullivan, 446 U.S. 335, 346, 100 S. Ct. 1708, 1717 (1980). Third, the cases upon which Goodson relies to show that joint representation is

_____

[12]The district court outlined four areas of potential conflict: (1) because a plea by Goodson would be adverse to Rayburn's interests, Fawer would have a conflict in advising Goodson regarding plea negotiations; (2) evidence could develop at trial that pitted one defendant's interest against the other's; (3) Goodson's and Rayburn's interests could diverge at sentencing, over issues such as their respective roles in the offense; and (4) because Fawer received confidences from Rayburn, Fawer's cross-examination of Rayburn would be problematic.

18

permissible despite possible conflicts of interest involve claims of ineffective assistance of counsel.  In those cases, the courts employed a retrospective, record-based inquiry in order to determine whether an attorney was operating under a conflict of interest.  Their findings of "no conflict" are of limited usefulness here, where the district court predicated its denial of the motion to associate counsel on a finding of serious <u>potential</u> conflict.  Goodson fails to appreciate the distinction between a retrospective inquiry of actual conflict and a prospective inquiry into serious potential conflict.

The evaluation of the facts and circumstances of each case under the <u>Wheat</u> standard "must be left primarily to the informed judgment of the trial court."  <u>Wheat</u>, 486 U.S. at 164, 108 S. Ct. at 1700.  The district court made specific findings as to four potential areas of serious conflict.  We find that the district court did not abuse its discretion in denying Goodson's motion to associate Fawer.

C.  Louisiana Video Poker License as "Property"

Maria Goodson and Attorney Cleveland assert that a Louisiana video poker license is not "property" for purposes of the mail fraud statute, 18 U.S.C. § 1341.  Less than two years ago, we reached a contrary conclusion in <u>United States v. Salvatore</u>, 110 F.3d 1131 (5th Cir. 1997).  Bound by our prior decision, we do not revisit this issue.

D.  Fair Notice

19

Maria Goodson and Cleveland argue that, at the time of their mail fraud offenses, they did not have fair notice that the acts charged were crimes. They claim that they did not have notice (1) that unissued video poker licenses constituted property under the mail fraud statute, and (2) that certain information needed to be reported to the Louisiana State Police on the video poker license applications. We find these arguments devoid of merit.

"The test of whether a statute is unconstitutionally vague so as to deprive fair notice is whether it provides a person of ordinary intelligence a reasonable opportunity to know what is proscribed." United States v. Brewer, 835 F.2d 550, 553 (5th Cir. 1987). With regard to the first claim, we note that, at the time of the charged conduct, a circuit split existed as to whether or not unissued licenses constituted property for purposes of the mail fraud statute. Although we had not yet ruled on the issue, at least two circuits had found that unissued licenses are property for mail fraud purposes. Accordingly, we conclude that, assuming each to be of ordinary intelligence, Maria Goodson and Cleveland had reasonable opportunity to know that their conduct could be proscribed by the mail fraud statute. Cf. United States v. Brumley, 116 F.3d 728, 732 (5th Cir. 1997) (en banc) ("Constructions of a statute announced by the Supreme Court or lower courts can give citizens fair warning, even if the cases are not fundamentally similar." (quotation marks omitted)).

We are equally unpersuaded by Maria Goodson and Cleveland's claim that they did not have fair notice that the Louisiana State

20

Police required disclosure of indefinite and contingent plans to acquire an equity interest in a video poker licensee at some unspecified time in the future, or an ownership or other interest in a licensee of less than five percent.  The "Affidavit of Full Disclosure" that accompanied the initial and renewal applications explicitly required that video poker applicants be the "sole beneficial owner of any direct or indirect interest in or to a licensed gaming operation . . . except such as having been reported in writing to the Louisiana State Police."  The affidavit required that applicants attest that they had (1) "no agreements or understandings with any other person and no present intent to hold as agent, nominee, associate, third party or otherwise any direct or indirect interest whatsoever in or to the licensed gaming operation" and (2) "no agreements or understandings with any other person and no present intent to transfer at any future time any interest whatsoever . . . ."  We find that this language provided a person of ordinary intelligence adequate notice that ownership interests in any amount must be disclosed to the Louisiana State Police.  Similarly, we find the "agreement or understanding" language sufficiently broad to include indefinite and contingent plans to acquire equity interests at some unspecified future time.  We therefore conclude that Maria Goodson and Cleveland had fair notice.

      E.  State Law "Ownership" Jury Instructions

21

Cleveland, Fred Goodson, and Maria Goodson claim that the district court erred in refusing to charge the jury concerning certain state-law concepts of ownership.  The district court refused to give the requested instructions because, inter alia, the state-law concepts did "not go to the guilt or innocence of the defendants."  We review a district court's refusal to provide a requested instruction for abuse of discretion.  See United States v. Pennington, 20 F.3d 593, 599 (5th Cir. 1994).  Although we have recognized the importance of instructing on legal concepts significant to a theory of defense, see, e.g., United States v. Cavin, 39 F.3d 1299, 1310 (5th Cir. 1994) (reversing a conviction because the court failed to instruct on state ethical rules relevant to an attorney's theory of defense), we have never required that a district court instruct a jury on peripheral concepts that do not directly implicate an essential element of the charged offense.

Cleveland argues that the ownership instructions were directly relevant to both his guilt or innocence and that of Fred and Maria Goodson.  According to Cleveland, the critical issue to be decided by the jury was whether TSG, Ltd.'s license applications contained "fraudulent representations or omissions," that is, whether in keeping with the Government's theory of the case, the mailed video poker license applications failed to disclose hidden interests of Fred Goodson and Carl Cleveland in

TSG, Ltd., as owners, option holders, or pledge recipients.[13] Cleveland contends that the jury could not fairly decide who owned TSG, Ltd. without knowing whether Goodson or Cleveland had enforceable ownership interests under state law.

We disagree. The jury was instructed to find whether the video poker license applications were fraudulent in so far as affidavits submitted by Maria and Alex Goodson failed to mention any (1) agreements or understandings with any other persons to hold their interests as a nominee, agent or otherwise, and/or (2) agreements or understandings with any other person and a present intent to transfer at any future time any interest whatsoever in TSG, Ltd. Whether the "agreements or understandings" were enforceable under state law is not relevant to the question of whether Maria and Alex Goodson failed to disclose such arrangements to the Louisiana State Police. Accordingly, we find that the district court did not abuse its discretion in refusing to charge the jury as requested by Appellants. See Pennington, 20 F.3d at 600 (explaining that reversal is warranted only if the requested instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important issue in the trial).

_____

[13]The district court instructed the jury that an essential element of mail fraud—distinct from specific intent—is that a defendant knowingly created a scheme to defraud. Such a scheme, according to the district court's instructions, must involve false or fraudulent representations or omission reasonably calculated to deceive persons of ordinary prudence and comprehension.

Fred Goodson, Maria Goodson, and Cleveland also challenge the district court's supplemental instruction to the jury. In particular, they contend that the district court erred in giving a supplemental instruction that ignored state-law ownership principles and embraced the Government's theory that ownership could be determined simply from informal discussions.

After deliberations began, the jury sought clarification of three issues: (1) the legal definition of a partnership in commendam, (2) how much control is given up by partners, and (3) who appoints a general manager. In response, the district court provided the jury a general description of a partnership in commendam and the authority of the general and limited partners. The court concluded its supplemental instruction by charging the jury, over defense objections: "It is for you to determine based on all the evidence in the case what the parties' arrangements were as to control, ownership and management of Truck Stop Gaming, Ltd."

We find no reversible error.

> A trial judge enjoys wide latitude in deciding how to respond to a question from the jury. "When evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it."

United States v. Mann, 161 F.3d 840, 864 (5th Cir. 1998) (footnotes omitted) (quoting United States v. Stevens, 38 F.3d 167, 170 (5th Cir. 1994)). In this case, the court's supplemental instruction was reasonably responsive to the jury's

24

questions.  Moreover, as mentioned above, satisfaction of state law requirements for ownership transfers was not a critical issue to be decided by the jury.

### F.  Travel Act Jury Instructions

Bankston was convicted on two Travel Act counts, which incorporated Louisiana's public bribery statute.  He argues that his conviction ought to be reversed because the district court abused its discretion in failing to submit to the jury proposed charges on gift, attempted bribery, and circumstantial evidence.

First, Bankston asserts that he was entitled to an instruction that it is legal for a legislator to receive a gift. Such an instruction, however, was unnecessary given the district court's charge that the Government had to prove beyond a reasonable doubt that Bankston, as the receiver of the bribe, acted "with the specific intent to be influenced in his conduct . . . as a Louisiana senator."  Whether Bankston could lawfully receive a gift was wholly irrelevant to the jury's inquiry.  Because the district court's Travel Act instruction was clear, detailed, and substantially covered the charge suggested by Bankston, the court's refusal to instruct on gift does not amount to error.

Second, Bankston, complains that the district court refused to instruct the jury on the lesser included offense of attempted bribery under Louisiana law.  He argues that, in Louisiana, such an instruction is not discretionary and that, had the jury found only attempted bribery, the elements of the Travel Act charge

25

would not have been met.  In federal prosecutions for violations of the Travel Act, we have never required that district courts instruct on lesser included offenses.  Accordingly, we find Bankston's argument to be devoid of merit.

Third, Bankston argues that the district court committed reversible error by failing to instruct on Louisiana's "circumstantial evidence rule."  Because we have squarely rejected efforts to graft non-substantive points of state law into RICO charges, Bankston's claim fails.  See, e.g., United States v. Brown, 555 F.2d 407, 418 n.22 (5th Cir. 1977) (explaining that "'the reference to state law in the federal statute is for the purpose of defining the conduct prohibited' and is not meant to incorporate the state statute of limitations or procedural rules" (quoting United States v. Revel, 493 F.2d 1, 3 (5th Cir. 1974))).

### G.  Witness Testimony

Cleveland, Fred Goodson, and Maria Goodson claim that the Government elicited improper witness testimony from two law enforcement officials, FBI Special Agent Gross and State Police Lieutenant Blackwelder.  They launch four attacks on Gross and Blackwelder's testimony: (1) that both witnesses testified to legal conclusions, (2) that both witnesses gave testimony in the form of opinion, (3) that both witnesses testified as to "ultimate issue[s] of fact," and (4) that Gross's testimony exceeded his limited "summary" capacity.  Evidentiary rulings

26

are reviewed for abuse of discretion.  See General Electric Co. v. Joiner, ___ U.S. ___, ___, 118 S. Ct. 512, 517 (1997).

We find that the district court did not abuse its disretion in permitting the challenged testimony.  Because neither Gross nor Blackwelder was designated as an expert witness, most of the caselaw that Cleveland cites for the proposition that a witness cannot testify in the form of an opinion is inapplicable.  Unlike expert witnesses, lay persons are allowed more leeway under the Federal Rules in testifying in the form of opinions.  See Fed. R. Evid. 701.  Lay persons are explicitly allowed to testify in the form of opinion or inference on "ultimate issue[s] to be decided by the trier of fact."  Fed. R. Evid. 704.  Additionally, witnesses can testify in more than one capacity.  See United States v. Castillo, 77 F.3d 1480, 1499 (5th Cir. 1996) (noting that a summary witness could testify in multiple capacities). Accordingly, Special Agent Gross could have testified as a lay fact witness as well as a summary witness.  Having reviewed both Agent Gross's and Lieutenant Blackwelder's testimony, we find no reversible error.

### H.  Magazine Article Admission

Fred Goodson, Carl Cleveland, and Bankston challenge the district court's admission of a magazine article titled "Lies, Bribes and Videotape," found in the FBI's search of Fred Goodson's office.  The district court admitted the article during redirect examination of FBI Special Agent Gross and instructed the jury that the article was being admitted not for the truth of

27

the matter asserted, but solely on the issue of the state of mind of Fred Goodson, i.e., to contradict his assertions that he lacked knowledge and sophistication about politics and the types of transactions at issue. Evidentiary rulings are accorded considerable deference on appeal; "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Fed. R. Evid. 103(a); see United States v. Brito, 136 F.3d 397, 412 (5th Cir. 1998).

Fred Goodson and Cleveland contest the admissibility of the article both as to relevance and as to prejudicial effect. Even were the article both irrelevant and prejudicial, however, its admission did not affect a substantial right of either Goodson, Cleveland, or Bankston. First, the district court did not allow introduction of the article by the Government until redirect examination. Second, the district court permitted only "narrow clarifying" references to the article in light of the defense's introduction, on cross examination, of other documents etc. that had been found in the same folder as the "Lies, Bribes and Video Tape" article. Third, the Government's redirect regarding the disputed article constituted less than four pages of transcript. Fourth, on recross, the defense had the opportunity to question Agent Gross in detail about the subject matter of the article and elicited from him representations that the investigation described in the article in no way involved "anybody in this room."

28

For these reasons, we find that the admission of the "Lies, Bribes and Video Tape" article did not affect a substantial right of any appellant.

### *I.* Prosecutor's Closing Remarks

All appellants claim that in his rebuttal argument the prosecutor made improper and inflammatory remarks, inviting the jury to convict the defendants in order to "make a change" and to "start taking back [their] state." Appellants argue that the district court's subsequent instruction failed to cure the taint of the improper closing and that reversal is therefore required.[14]

A criminal defendant bears a substantial burden when attempting to demonstrate that improper prosecutorial comments constitute reversible error. "'A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.'" United States v. Lowenberg, 853 F.2d 295, 302 (5th Cir. 1988) (quoting United States v. Young, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044 (1985)). Improper prosecutorial comments require reversal only if the comments substantially affected the defendant's right to a fair trial. See United States v. Murrah,

---

[14]The district court, both at trial and in its opinion on defendants' motions for new trial, recognized the impropriety of the prosecutor's "make a change" closing. At the conclusion of the prosecutor's argument, the court instructed the jury to disregard the prosecutor's improper remarks:

> I would like to instruct you again that this case is not about the general conditions in the state of Louisiana. To the extent that Mr. Manger made reference to that in his closing argument, you are instructed to disregard the comments about the general condition of Louisiana state government as it relates to education or other issues.

888 F.2d 24, 27 (5th Cir. 1989). In evaluating the extent to which prosecutorial comments affected a defendant's right to a fair trial, three factors are considered: the magnitude of the prejudicial effect of the remarks, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt. See United States v. Casel, 995 F.2d 1299, 1308 (5th Cir. 1993).

Here, the inflammatory remarks, to which defense counsel objected at trial, came at the end of the prosecutor's rebuttal argument. The improper prosecutorial comments responded to improper arguments made by counsel for Rayburn. Any prejudicial effect inhering to the Goodsons, Bankston, and/or Cleveland, it seems, would have been substantially less than that attaching to Rayburn. Rayburn's acquittal therefore suggests that the jury was not influenced by the improper comments.[15]

With regard to the efficacy of the district court's instruction, the court more than once instructed the jury to disregard the improper arguments. The language the court adopted when instructing the jury for the second time was in part borrowed from the words of Bankston's attorney. We find sufficiently curative both the district court's repeated instruction to disregard the improper argument as well as its caution to the jury that lawyer argument was not evidence.

---

[15]Appellants argue that Rayburn's "sympathy" acquittal is of little significance because he was 80 years old at the time of the trial. Rayburn, however, was not the only defendant acquitted of charges. The fact that each appellant was found not guilty on some counts suggests that the jury reached its verdict free of the taint of the prosecutor's improper remarks.

30

Finally, as to the strength of the evidence of guilt, our review of the trial record in its entirety reveals that the evidence presented by the Government was sufficient to support each of the convictions against each of the appellants.  Thus, we conclude that the prosecutorial comments did not substantially affect the Goodsons', Cleveland's, or Bankston's respective rights to a fair trial.

### J.   Sufficiency of the Evidence

Fred Goodson, Maria Goodson, and Larry Bankston contest the sufficiency of the evidence to support their respective convictions.  In evaluating the sufficiency of the evidence on appeal, we consider the evidence in the light most favorable to the Government, drawing all reasonable inferences in support of the jury's verdict.  See United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996).  The evidence is sufficient if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Gaytan, 74 F.3d 545, 555 (5th Cir. 1996).  The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.   See Lopez, 74 F.3d at 577.

We address the arguments raised by each appellant in turn.

### 1.   Fred Goodson

Fred Goodson argues that the evidence is insufficient to support his two-count conviction for mail fraud because it fails to establish that he had the specific intent to commit fraud.

To establish a mail fraud violation under 18 U.S.C. § 1341, the Government must demonstrate (1) a scheme to defraud, (2) the use of mails to execute that scheme, and (3) the defendant's specific intent to commit fraud.  See United States v. Tencer, 107 F.3d 1120, 1125 (5th Cir. 1997).  "Intent to defraud requires an intent to (1) deceive, and (2) cause some harm to result from the deceit."  United States v. Jimenez, 77 F.3d 95, 97 (5th Cir. 1996).  A defendant has the intent to defraud if he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary "loss to another or bringing about some financial gain to himself."  United States v. Blocker, 104 F.3d 720, 732 (5th Cir. 1997).

According to Goodson, the mail fraud charges rested on two premises: that he and Cleveland were the "true owners" of Truck Stop Gaming, and that they hid that fact from regulators in order to avoid a suitability investigation of their finances.  Goodson, on appeal, contests the sufficiency of the evidence only as it relates to the second premise--Goodson and Cleveland's avoidance of a suitability investigation.

This second premise, however, does not constitute an essential element of mail fraud.  Instead, the desire to avoid a suitability investigation relates merely to motive, representing the Government's theory as to why Cleveland and Goodson committed

32

the fraud.  Because we have never required the Government to prove nor the jury to find motive beyond a reasonable doubt, Fred Goodson's argument fails.

### 2.  Maria Goodson

Maria Goodson challenges the sufficiency of the evidence for her mail fraud conviction.  She claims that the Government failed to establish that she knowingly, and with specific intent to defraud, participated in a scheme to hide either (1) the true ownership interests of her father and Carl Cleveland in TSG, Ltd. or (2) the 4.99% ownership interest held by Benny Rayburn, Jr.

Because the jury need only have found Maria Goodson guilty beyond a reasonable doubt on one of the two potential schemes underlying her mail fraud conviction, we address only the evidence concerning Maria Goodson's specific intent to conceal the 4.99% ownership interest transferred to Benny Rayburn.  The Government presented the jury with a document dated August 1, 1994, signed by Maria Goodson in which she agreed to "assign, sell, convey and deliver unto Benjamin B. Rayburn, Jr. a 4.99% interest out of a 100% interest in the Truck Stop Gaming, Ltd. partnership."  Evidence showed that the transfer of this interest was not reported to the State Police in TSG, Ltd.'s 1995 license renewal application, even though such minority purchases were required to be reported.

Maria Goodson's awareness of the transfer of ownership is indicated by two pieces of evidence.  First, she signed the conveyance itself.  Second, in a recorded conversation between

33

Maria Goodson and family accountant Joe Morgan, she described BAJ, LLC, the limited liability company to which Rayburn ultimately transferred his 4.99% interest, as having become a 4.9% partner. Accordingly, we find that the jury had sufficient evidence to convict Maria Goodson for mail fraud.

### 3. Larry Bankston

Larry Bankston contests the sufficiency of the evidence as to his conviction on two counts of violating the Travel Act, 18 U.S.C. § 1952 (1997). The first count involved an interstate telephone call on June 20, 1995, from Fred Goodson to Meyer Realty to set up what was alleged to have been a bribe in the form of a "sham" rental of Bankston and his wife's Gulf Shores condominium. The second involved Fred Goodson's use of an interstate commercial carrier on June 22, 1995, to forward a $1,555.01 check to Meyer Realty as payment for the condominium rental.

> The essential elements for a Travel Act conviction are:
> (1) travel or use of the mail or any facility in interstate or foreign commerce;
> (2) with the specific intent to promote, manage, establish, or carry on--or distribute the proceeds of-- unlawful activity; and
> (3) knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel or use of the mail or facility of interstate or foreign commerce.

34

See United States v. Logan, 949 F.2d 1372, 1380-81 (5th Cir. 1991).  Under Louisiana law, an elected official is guilty of public bribery if he accepts anything of apparent present or prospective value with the specific intent to be influenced in his employment, position, or duty.  See La. Rev. Stat. Ann. § 14:118 (West Supp. 1999).

Bankston attacks the sufficiency of the evidence on three separate grounds: (1) insufficient proof that he had the requisite intent to be influenced in his official conduct by the condominium rental; (2) insufficient proof that the condominium rental amounted to anything more than a legal gift; and (3) insufficient proof that he committed an overt act in furtherance of the alleged bribery after the interstate communications at issue.

The evidence at trial does not support Bankston's claim. The evidence showed that in February 1995 Bankston and his wife discussed establishing an arrangement whereby a proposed "renter" would pay to use their Alabama condominium despite the renter's true intention not to do so.  Records from Meyer Realty showed that Fred Goodson rented the Bankstons' condominium and paid for the rental by check.  Testimony from FBI agents revealed that the Bankston family, not Goodson, used the condominium during the rental week in question.  Finally, the jury heard many intercepted conversations between Bankston and others in which Bankston indicated that he would use the power of his office to protect Goodson's video poker interests during the legislative

35

session.  Based upon this evidence, we affirm Bankston's
conviction on the two Travel Act counts.

## K.  Sentencing

### 1.  Maria Goodson

#### a.  Section 5K2.7 Upward Departure

Maria Goodson complains that the district court improperly
enhanced her offense level six points for a "significant
disruption of governmental function," pursuant to U.S. Sentencing
Guideline section 5K2.7.[16]  She argues that the disruption
identified by the district court is not the type of "significant"
disruption that the Commission contemplated when drafting
section 5K2.7 and that, although the submission to a state agency
of one false application may disrupt the agency's function, it
only does so in an "ordinary" sense.  We disagree.

A district court has "wide discretion" in imposing a
section 5K2.7 upward departure.  United States v. Hatch, 926 F.2d
387, 397 (5th Cir. 1991) (explaining that the Fifth Circuit has
repeatedly granted district courts "wide discretion to decide
whether aggravating factors exist to support an upward

---

[16]Section 5K2.7 provides in part:
> If the defendant's conduct resulted in a significant disruption of a
> governmental function, the court may increase the sentence above
> the authorized guideline range to reflect the nature and extent of the
> disruption and the importance of the governmental function
> affected.  Departure from the guidelines ordinarily would not be
> justified when the offense of conviction is an offense such as bribery
> or obstruction of justice; in such cases interference with a
> governmental function is inherent in the offense, and unless the
> circumstances are unusual the guidelines will reflect the appropriate
> punishment for such interference.

departure"). The appropriateness of a departure turns on the importance of the government function impacted, not the degree of the impact. <u>Cf.</u> <u>Hatch</u>, 926 F.2d 387 (affirming a 5K2.7 upward departure based on the defendant, a former Louisiana sheriff, authorizing payments, representing a portion of the sheriff office's operating budget, to a purported jail construction project consultant); <u>United States v. Garcia</u>, 900 F.2d 45 (5th Cir. 1990) (holding that an upward departure was warranted and reasonable where postal inspectors recovered 248 first-class letters from the possession of a defendant postal employee). Here, when Maria Goodson submitted TSG, Ltd.'s false 1995 renewal application, failing to disclose any ownership interest held by Fred Goodson, Carl Cleveland, or Benny Rayburn, she effectively shielded those men from suitability analysis. In doing so, Maria Goodson thwarted Louisiana's video poker regulatory and licensing scheme designed to investigate the honesty and integrity of prospective license holders. Based upon the importance of that regulatory scheme, we find that the district court did not abuse its discretion in imposing a section 5K2.7 upward departure.

b.  Loss Calculation

The Government, in its cross-appeal, contends that the district court miscalculated Maria Goodson's offense level. Maria Goodson was convicted of one count of mail fraud in connection with TSG, Ltd.'s 1995 license renewal application. The district court sentenced her in accordance with section 2F1.1 of the Sentencing Guidelines. That section specifies a base

37

offense level of six for fraud and provides for incremental increases in the offense level depending on, <u>inter alia</u>, the amount of loss caused by the fraud.  <u>See</u> U.S. Sentencing Guidelines Manual § 2F1.1 (1997).  In calculating Maria Goodson's offense level, the court found that the State of Louisiana had suffered no "actual or intended monetizable loss . . . by virtue of Ms. Goodson's having fraudulently obtained the license." Accordingly, the district court did not increase Ms. Goodson's base offense level for any loss.

The Government asserts that the district court erred in finding that the State of Louisiana suffered no loss and in failing to use defendant's gain as an alternative method of valuation.  The Government asserts that, in keeping with section 2F1.1's Application Note 8, Maria Goodson's base offense level should have been increased eleven levels based upon TSG, Ltd.'s $1.4 million annual gain.  <u>See</u> U.S. Sentencing Guidelines Manual § 2F1.1 App. Note 8 (1997); <u>see also</u> <u>United States v. Smithson</u>, 49 F.3d 138, 144 (5th Cir. 1995) (recognizing that under section 2F1.1, Application Note 8, a sentencing court may utilize the offender's gain as an alternative valuation method for assessing the amount of loss when the loss is difficult to determine).

In its sentencing cross-appeal, the Government urges use of TSG, Ltd.'s $1.4 million annual revenues as the appropriate valuation of Maria Goodson's gain, yet throughout trial and all subsequent forfeiture proceedings, the Government argued that

Maria Goodson, in fact, was not the "true owner" of TSG, Ltd. The verdict of the jury as well as the district court's judgment of forfeiture confirmed the success of the Government's hidden ownership theory of prosecution. Accordingly, we consider Fred Goodson and Carl Cleveland the true owners of TSG, Ltd. and agree that TSG, Ltd.'s $1.4 million gain could not be attributed to Maria Goodson, a non-owner. Therefore, the district court did not err in refusing to use TSG, Ltd.'s $1.4 million annual revenues as an alternative valuation method for loss pursuant to section 2F1.1.

### 2. Bankston

### a. Eleven-level Enhancement

Bankston challenges as unsupported by the evidence the district court's eleven-level increase in his base offense level under section 2C1.1(b)(2)(A). This Court examines a district court's factual findings only for clear error and affords great deference to the court's application of the Guidelines to those facts. See United States v. Snell, 152 F.3d 345, 346 (5th Cir. 1998).

The district court, relying on the Presentence Report ("PSR") as well as facts elicited at trial and the forfeiture proceeding, based Bankston's offense level enhancement on its calculation of the "expected benefit to be received by the individual paying the bribe," namely Fred Goodson.[17] The

---

[17]The Guidelines assign punishment at the greatest of three calculations: (1) the value of the bribe; (2) the value of the benefit to be received; or (3) if the offense involved payment

39

district court found that the benefit to be received by Goodson in return for the bribe was protection for a two-year period from legislation that would otherwise interfere with the continued operation of his video poker business.  The district court, recognizing that evidence at trial supported a finding that Goodson held a 50% interest in TSG, Ltd., determined that the expected benefit to be received by Goodson was one-half the profits to TSG, Ltd. for a two-year period, or $1.4 million.  We find the district court's "Reasons for Sentencing of Larry S. Bankston" to be thorough and well-reasoned.  Bankston's assertion of error is meritless.

### b.  Expected Benefit

The Government, on cross-appeal, argues that the district court erroneously reduced the expected benefit to be received for the bribe to the ownership percentage in TSG, Ltd. of the briber, Fred Goodson.  Specifically, the Government contends that the district court erred in limiting "benefit" as used in section 2C1.1(b)(2)(A) to "personal benefit," failing to consider the actual benefit sought, the continued unfettered operation of the RICO enterprise.  The issue raised by the Government is one of first impression for this Circuit.

It is well established that sentencing courts are bound by "commentary in the Guidelines Manual that interprets or explains a guideline . . . unless it violates the Constitution or a

---

for the purpose of influencing an elected official, an eight-level increase.  <u>See</u> U.S. Sentencing Guidelines Manual § 2C1.1 (1997).

40

federal statute, or is inconsistent with, or [is] a plainly erroneous reading of, that guideline." See Stinson v. United States, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915 (1993). The Commentary to section 2C1.1 states that for deterrent purposes, the punishment should be commensurate with the "gain to the payer or the recipient of the bribe," whichever is higher. As contemplated by the Commission, the "gain to the payer" is the "value of the benefit received or to be received." Thus, the expected benefit to be received as referenced in section 2C1.1 is the benefit to the payer of the bribe.

Resolution of the Government's cross-appeal, therefore, turns on the identity of the "payer." If Fred Goodson, in his individual capacity, bribed Bankston, then the district court properly limited "expected benefit" to an amount equivalent to Goodson's personal benefit. If, on the other hand, Fred Goodson, as agent for TSG, Ltd., bribed Bankston, then the Government would be correct that the expected benefit ought to be measured by the profits to the RICO enterprise.

The issue of the identity of the payer is a question of fact best resolved by the district court. Because the evidence presented at trial could support either the individual-capacity or RICO-enterprise theory of bribery, we cannot conclude that the district court committed clear error in determining that the personal benefit to Goodson was the appropriate valuation of the expected benefit to be received.

L. RICO Forfeiture

41

A person who violates RICO must forfeit any interest acquired or maintained in violation of the statute, any enterprise established or conducted in violation of RICO, and any property constituting or derived from proceeds obtained in violation of RICO.  See 18 U.S.C. § 1963(a).  Here, the Government sought, and the district court ordered, the forfeiture of both Fred Goodson's and Carl Cleveland's interests in TSG, Ltd., in an amount equal to the proceeds received by TSG, Ltd. between July 1994 and August 1995.  Fred Goodson,[18] Carl Cleveland, Maria Goodson, Alex Goodson, and TSG, Inc. appeal, albeit on different grounds, the district court's judgment of forfeiture.

With regard to Fred Goodson's and Carl Cleveland's claim, we note that the district court ordered that the proceeds of TSG, Ltd. be forfeited pursuant to 18 U.S.C. § 1963(a)(1) and (a)(2), as well as (a)(3).  Goodson, though, attacks only two of these three grounds.  He raises no error as to the forfeiture of proceeds under § 1963(a)(3).  Given the identity of proceeds forfeited pursuant to each theory, we affirm the district court's August 1997, forfeiture order.

Maria Goodson, Alex Goodson, and TSG, Inc. argue that the district court erred in failing properly to apply Louisiana law to the question of ownership of TSG, Ltd. and TSG, Inc.  They assert that no state law exists that would support the district

---

[18]Carl Cleveland incorporates Fred Goodson's forfeiture arguments.

court's ruling that Fred Goodson and Carl Cleveland were the "true owners" of TSG, Ltd.

Section 1963(l)(6)(A) provides petitioners the opportunity to recoup forfeited property if they can establish by a preponderance of the evidence either (1) that they have a current legal right, title, or interest in the property and that the right, title, or interest was vested in them instead of the defendant at the time of the commission of the RICO offenses; or (2) that they have a current legal right, title, or interest in the property and that the right, title, or interest was superior to the right, title, or interest of the defendant at the time of the commission of the RICO offenses. See 18 U.S.C. § 1963(l)(6)(A). We review the district court's findings of fact under the clearly erroneous standard of review and the question of whether those facts constitute legally proper forfeiture de novo. See United States v. Marmolejo, 89 F.3d 1185, 1197 (5th Cir. 1996).

Maria and Alex Goodson assert that they are the record owners of TSG, Ltd. and its corporate general partner, TSG, Inc. They point to TSG, Ltd.'s Agreement of Partnership, which they both signed and which was filed with the Louisiana Secretary of State, as evidence of their current and superior interest in the forfeited companies. They urge us to find that the district court improperly disregarded their partnership agreement when it concluded that Fred Goodson and Carl Cleveland were the true owners of TSG, Ltd.

43

We agree with the district court's decision not to allow an obviously false partnership agreement to be used to provide the basis for a claim of interest under § 1963(l)(6)(A). As the district court indicated, the jury's verdict in the instant case established that Fred Goodson, Maria Goodson, and Carl Cleveland perpetrated a fraud on the State of Louisiana. The jury necessarily found that Fred Goodson and Carl Cleveland were the true owners of TSG, Ltd. and that Maria Goodson and her brother Alex were straw people used in the sham to hide the true ownership of TSG, Ltd.

Testimony at the October 31, 1997 evidentiary hearing to determine the interests of Alex and Maria Goodson bolsters our resolve not to allow them to assert ownership in the TSG entities based upon their "sham" partnership agreement. With regard to Alex Goodson, the district court found that his hearing testimony revealed that he did not consider himself to have any real interest in either TSG, Inc. or TSG, Ltd. Alex described his involvement with the companies as someone executing an ownership document as an agent of the company, in the capacity of a nominee. His testimony revealed that he had no understanding of the "contribution" that was attributed to him in the partnership agreement for TSG, Ltd. As to Maria Goodson, the court found that her testimony likewise "fell short of establishing that she and her brother . . . were the true owners of the Truck Stop Gaming entities." In particular, Maria Goodson told the court at the forfeiture hearing that at the time the companies were

44

formed and incorporated, she did not associate a company being "in her name" with ownership. Equally problematic was a conversation with Carl Cleveland in which she requested 1% of the net profits of TSG, Ltd. If she had in fact been the owner of the TSG entities, she would not have needed to ask Carl Cleveland for an interest in a percentage of the companies' profits.

In light of the above evidence, the district court properly disregarded the "sham" partnership agreement. Consistent with the detailed analysis provided in the district court's April 1998 order, we conclude that Alex Goodson, Maria Goodson, and TSG, Inc. failed to demonstrate by a preponderance of the evidence a legal right, title, or interest in TSG, Ltd. Their appeal of the district court's April 1998 judgment of forfeiture, therefore, fails.

### III. CONCLUSION

Appellants raise an abundance of evidentiary, statutory, and constitutional challenges, none of which warrant reversal. For the reasons stated above, we affirm each Appellant's judgment of conviction and sentence as well as the judgment of forfeiture. AFFIRMED.