Filed:  October 17, 2002

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

No. 99-4783
(CR-99-58, CR-99-134, CR-99-135)

————————

United States of America,

Plaintiff - Appellee,

versus

Mark Paul Sarno,

Defendant - Appellant.



————————

No. 00-4795
(CR-99-58, CR-99-134, CR-99-135)

————————

United States of America,

Plaintiff - Appellee,

versus

Mark Paul Sarno,

Defendant - Appellant.

---

On Petition for Rehearing and Rehearing En Banc

---

The appellant's petition for rehearing and rehearing en banc was submitted to this Court. As no member of this Court or the panel requested a poll on the petition for rehearing en banc, and

As the panel considered the petition for rehearing and is of the opinion that it should be denied,

IT IS ORDERED that the petition for rehearing and rehearing en banc is denied.

IT IS FURTHER ORDERED that the slip opinion is modified as follows: on page 7, line 10 of the text of Part B, the word "then" is changed to read "had."

Entered at the direction of Judge Widener, with the concurrence of Judge Luttig and Judge Goodwin.

For the Court

/s/ Patricia S. Connor

Panel rehearing and rehearing
en banc denied and opinion
modified by order filed 10/17/02

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

  v.    No. 99-4783

MARK PAUL SARNO,
 *Defendant-Appellant.*

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

  v.    No. 00-4795

MARK PAUL SARNO,
 *Defendant-Appellant.*

Appeals from the United States District Court

for the Middle District of North Carolina, at Durham.

 William L. Osteen, District Judge.
 (CR-99-58, CR-99-134, CR-99-135)

  Argued: December 4, 2001

  Decided: May 24, 2002

Before WIDENER and LUTTIG, Circuit Judges, and

Joseph R. GOODWIN, United States District Judge for the

Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Stephen Clayton Gordon, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant. Lawrence Patrick Auld, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Raleigh, Noth Carolina, for Appellant. Benjamin H. White, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.

———————————————————————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

———————————————————————————

**OPINION**

PER CURIAM:

Mark Paul Sarno (defendant) pleaded guilty and was sentenced for loan application fraud, 18 U.S.C. § 1014, credit card fraud, 18 U.S.C. § 1029(a)(2), and mail fraud, 18 U.S.C. § 1341. Defendant appeals the district court's denial of three motions, the district court's application of three sentencing guidelines, and also raises an *Apprendi* issue. We affirm the district court's decision in each of those claims.[1]

I.

A.

The following facts underlie the charges. As to the loan application fraud charge, on October 6, 1998 Defendant applied for two loans, totaling $159,500, from the First Citizens Bank and Trust in Greensboro, N.C. On the application, defendant listed Paul Kaiser as co-writer or guarantor on the loans; in addition, a deed of trust with Kaiser's signature was attached to the application.

———————————————————————————

[1] The 1998 Sentencing Guidelines were used in this case.

2

Kaiser was described as the president and fifty-percent shareholder of Zaitech Holdings. Zaitech was allegedly a real-estate/ investment firm in Greensboro. Kaiser denied ever signing the deed of trust, ever owning interest in Zaitech Holdings, and ever agreeing to be a guarantor of the loan.

As to the credit card fraud charge, between February 1998 and January 1999, defendant obtained 13 credit cards through false statements. The alleged loss exceeded $85,000, with an intended loss in excess of $135,000.

As to the mail fraud charge, defendant falsely held himself out to be the sole proprietor of an investment firm to induce the victims to relinquish their money. The victims were mailed statements showing their alleged gains on the fake investments. More than $150,000 was invested.

B.

In January 1999, defendant was arrested and charged with violating supervised release on previous federal charges. He allegedly contacted Bill Osteen, an attorney, to represent him, but Sarno did not employ Bill Osteen, claiming the fee was too high.[2] Defendant claims that Bill Osteen had had previous contact with one of the banks, apparently concerning some unidentified source of money Sarno had sent to the bank. At the arraignment in March, David Freedman (Freedman) represented defendant where he entered a not guilty plea. Subsequently, defendant sent letters to the district court alleging problems with Freedman; however, when asked about the representation, defendant stated "Mr. Freedman will represent me, and that's fine." He also stated that he had no other issues to raise with the court. Two months later in May, defendant again stated he did not want to discharge Freedman. At the change of plea hearing when he pleaded guilty, defendant was given time to confer with counsel, was provided options as to sentencing, and unequivocally pleaded guilty to all three charges.[3] Defendant also acknowledged that he was waiving constitu-

---

[2] Defendant claims that Bill Osteen offered to represent him for $40,000.

[3] Defendant was repeatedly asked by the district court if he wished to discharge his counsel. Moreover, the district court stated it would not accept a guilty plea unless defendant knowingly and intelligently waived his right to a trial. Defendant twice reaffirmed his plea.

3

tional rights in so pleading. At the end of this proceeding, Freedman informed the court that he may move for a mental health evaluation; he did so on July 17, 1999.

Prior to sentencing, defendant actively filed various motions and attended multiple hearings on such motions. Defendant requested the discharge of Freedman, which the district court granted during the August 4, 1999 hearing.[4] At this same hearing, the court thoroughly questioned defendant about an alleged promise made by Freedman and the prosecution to debrief defendant on inconsistencies in the factual content of his plea. Shortly after the hearing, defendant filed a motion for a psychiatric evaluation; he also filed various other motions between August 9 and 23. On September 21, 1999, the district court denied the psychiatric evaluation after hearing argument on the matter.

Shortly after this September 21 hearing, Assistant Public Defender Thomas Cochran (Cochran) began representing defendant and did so throughout sentencing. On October 4, Cochran filed a position statement objecting to the Presentence Report (PSR) inclusion of the mass-marketing and abuse of trust enhancements and the exclusion of the acceptance of responsibility adjustment. On this same day, defendant's counsel also filed an "Acceptance of Responsibility" pleading. The two-day sentencing hearing began the next day on October 5.

The first day of sentencing defendant stated that he wished to challenge alleged false statements made by witnesses. The district court allowed this, but noted that the fact may weigh against a reduction under U.S.S.G. § 3E1.1 Acceptance of Responsibility. Defendant called Mr. Creason, an investor with defendant, who testified that he still did not believe Zaitech Holdings to be a fraud. The court did not find anything in the testimony to support defendant's motion and proceeded to sentencing. As to the mass-marketing and abuse of trust enhancements, the district court relied on the PSR and affirmed the application of the two provisions. As to the acceptance of responsibility, the court heard statements from the government and Camille Roberts that defendant had recently misled these investors, inducing them

---

[4] Defendant also filed motions alleging witness tampering by the United States Attorney's office.

4

to believe he would repay their money. The court allowed a two out of three point reduction for accepting responsibility, but expressed doubt in doing so.

On the second day of sentencing, defendant moved to withdraw his guilty pleas, alleging prosecutorial misconduct, concealment of evidence, government collusion, and perjury. In addition, defendant asserted ineffective assistance of counsel against his former attorney Freedman, claiming a conspiracy between Freedman and the government. The district court permitted defendant to write out his version of the facts, which he felt the PSR omitted, on the condition that the previous sentencing guideline rulings would be reconsidered. Mr. Stout, a witness unavailable the day before, also testified that less than a week before defendant assured him his funds were available. After hearing argument on the acceptance of responsibility issue, the district court reversed its decision and declined to grant a two-point reduction. Immediately prior to being sentenced, defendant requested the district court recuse itself, based on defendant's previous contact with Bill Osteen. Finding Bill Osteen was not retained by defendant and never made an appearance in the case, the district court declined defendant's motion for recusal. Defendant was then sentenced to 115 months imprisonment, to run consecutive to a 48-month supervised release violation.

At conclusion of the hearing, the court admonished Cochran to do three things: first, to "bring to the attention of the court within a period of 30 days any evidence that he has which may reflect that the United States Attorney has withheld and destroyed evidence in this case"; second, to investigate whether perjury had occurred; and third, to investigate possible collusion between Freedman and the U.S. Attorney's office. After investigating, Cochran reported by letter that he found no evidence to support the allegation of withholding or destroying evidence or perjury. As to collusion between David Freedman and Assistant U.S. Attorney Auld, both of whom denied any collusion, he could form no conclusion because a potential witness, Assistant U.S. Attorney Weinman, would not respond to his request without permission from his attorney. Weinman later spoke to Cochran, denying collusion with the defendant's attorney, and this was reported to the district judge by Cochran. The judgment of the district court was filed December 7, 1989.

5

II.

Defendant raises seven issues on appeal, three pertaining to the district court's application of the sentencing guidelines, three relating to denied motions, and lastly, an *Apprendi* issue.

A.

Defendant challenges the district court's denial of his motion to withdraw his guilty plea. We review a denial of a motion to withdraw a guilty plea for abuse of discretion. *United States v. Craig*, 985 F.2d 175, 178 (4th Cir. 1993). The question is whether the district court abused its discretion in finding that the defendant had not shown a "fair and just reason" for being allowed to withdraw his plea. *Craig*, 985 F.2d at 178 (citing Fed. R. Crim. P. 32(e) as the standard). The factors are (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources. *United States v. Moore*, 931 F.2d 245, 248 (4th Cir.), *cert. denied*, 502 U.S. 857 (1991).

We are of opinion that the district court did not abuse its discretion in refusing to allow the defendant to withdraw his guilty plea. Defendant originally pleaded not guilty but then signed a plea agreement. At the hearing on the change of plea, the court clearly explained to defendant his three choices: first, to hire a new lawyer; second, to plead not guilty and go to trial; third, to plead guilty. Defendant admitted that no promises or threats had been made which would have precluded voluntariness or knowledge. He did not object to the Rule 11 proceeding. While defendant stated that he and his attorney had disagreements, he conceded that he had cleared up all concerns with counsel. He showed no error or prejudice with the representation of his attorney. Defendant's motion was not timely, he waited until his sentencing hearing then decided to challenge his guilty plea. Moreover, the timing of the motion did not add to confidence in its

validity.[5] We are of opinion the district court did not abuse its discretion in its denial of Sarno's request to withdraw his plea of guilty.

## B.

Sarno also appeals the district judge's decision not to recuse himself. We review a denial of a district court's refusal to recuse itself for abuse of discretion: *United States v. DeTemple*, 162 F.3d 279, 283 (4th Cir. 1998), *cert. denied*, 526 U.S. 1137 (1999). Defendant moved for recusal at the eleventh hour, after the district court had determined all of the guideline applications; the judge declined to recuse himself and sentenced the defendant. The district judge affirmed his recusal decision by order dated October 27, 2000. This order specified that the judge had no notice of his son's alleged representation of defendant. Defendant then filed a judicial complaint, which was dismissed as frivolous by the Chief Judge of this court on April 20, 2000, being wholly unsupported by factual allegations. Defendant then petitioned the Circuit Judicial Council for a review of that order. The Judicial Council denied Sarno's Petition for Review on May 30, 2000.

28 U.S.C. § 455(b)(5)(ii) requires a judge to recuse himself if "he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person . . . is acting as a lawyer in the proceeding." Proceeding is then defined to include pretrial, trial, appellate review, or other stages of litigation. 28 U.S.C. § 455(d)(1).

Defendant alleges that Bill Osteen, the district court judge's son, was his lawyer in pretrial litigation. Apart from a brief reference to Bill Osteen at a detention hearing,[6] the only evidence of Bill Osteen's

---

[5] The district court noted the potential for bad-faith when it stated: "You are either not knowledgeable enough to enter a plea, or you're attempting to make a record to show later on that you were not ably represented by counsel. And we're going to shortstop both of those, because you're either going to have a jury trial or you're going to knowingly and willfully waive that and tender a plea of guilty."

[6] At a detention hearing on February 3, 1999 before Magistrate Judge Eliason, in which Sarno was represented by John Dusenbury, of the Federal Public Defender's office, Bill Osteen was referred to in relation to conversations Dusenbury had with First Citizens Bank on or around January 18.

7

involvement in this case is a letter dated March 26, 1999 from the attorney of First Citizens Bank to defendant. The letter reads:

> I am in receipt of your letter dated March 15, 1999 disputing the validity of your credit card debt to First Citizens. I was quite surprised to receive your letter, in that at no time during my telephone conversation with you and Bill Osteen did either of you dispute the validity of the debt.

Under the facts of this case, we find that the brief reference at the detention hearing and this letter are inadequate to find that the district court abused its discretion in denying recusal. First, as conceded by the defendant, Bill Osteen was never retained nor appeared as a lawyer of record in this case. Second, and in accord, this letter was addressed to defendant, not his alleged counsel Bill Osteen, not inferring that Bill Osteen was Sarno's attorney, especially in view of the fact that Sarno now claims that Judge Osteen was biased because his son was *not* employed by Sarno. Third, while we recognize the mandatory nature of 28 U.S.C. § 455(b)(5)(ii), the recusal motion was brought at the eleventh hour after six months of litigation. When this motion was not granted, defendant attempted to recuse the district court in an obvious effort to judge-shop to another district.[7] More importantly, however, there is no factual basis for defendant's claim that the judge had knowledge of this case from his son or was biased against defendant for not retaining his son in this action.[8]

### C.

Defendant next appeals the district court's denial of his motion for a psychiatric examination which was requested by Sarno for sentencing but which was *not* requested with respect to his plea of guilty to the merits. We review the refusal for an abuse of discretion. *United*

---

[7] During discussion on this recusal motion, the district court named all the judges in the Middle District of North Carolina to find one which defendant approved of; but the defendant claimed he could not receive a fair trial from any of the judges in the district.

[8] Defendant claimed the judge was unfair because he was angry that defendant declined to hire his son.

8

*States v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997), *cert. denied*, 522 U.S. 1090 (1998).

Defendant sought this evaluation to prove that he suffered from "significant reduced mental capacity" under Sentencing Guideline § 5K2.13, which defines the term in Application Note 1 to mean a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

The district court set a hearing on this motion at which the defendant could have, but did not, offer evidence. The only information before the district court as to the necessity for the mental examination was the motion of an earlier attorney, Freedman, and the statement of the defendant that, some 15 or 20 years before, apparently on account of a bank embezzlement charge in a New Jersey federal court, he, Sarno, had attended Gamblers Anonymous meetings, apparently as a result of psychological counseling. While the PSR indicated that Sarno's father thought that Sarno had some kind of a mental problem, the report indicated "There was no indication the defendant suffered from any mental and/or emotional disorders during the presentence interview. He was alert, cooperative, articulate, and appeared to provide well thought out responses to questioning on matters other than the instant offense." Sarno had told the probation officer that in the early 1980's he had experienced problems with gambling and acknowledged his willingness to participate in psychological counseling, from which the probation officer indicated he would benefit, in the officer's opinion.

On this record, the district court denied the motion of Sarno that he receive a mental examination, but the court stated: "And I would say whatever the sentence may be, that it would be my recommendation that you be housed at an institution, where, if you desire, and if the authorities think it appropriate, that you be given treatment that might assist you when you come out." The district court followed up this oral statement in its judgment, as follows: "The court makes the following recommendation to the Bureau of Prisons: the court recommends that the defendant be housed to receive mental health counseling." On this record, we are of opinion the order of the district court to deny a mental examination with respect to sentencing was not an

9

abuse of discretion and the judgment of the district court in that respect is affirmed.

The government argues that, in any event, Sarno should not be eligible for any reduction in sentence due to diminished capacity because of his extensive criminal record, which includes convictions for bank embezzlement, bank fraud, wire fraud, mail fraud, interstate transportation of falsely made securities, grand theft, escape, and a bad check charge between 1982 and 1998.

Because we believe the action of the district court in denying the mental examination was not an abuse of discretion, however, we express no opinion on the government's position with respect to the criminal record.

### D.

Defendant next challenges his sentence under *Apprendi*. Defendant must show plain error since he failed to raise this issue before the district court. *United States v. Kinter*, 235 F.3d 192, 199-200 (4th Cir. 2000), *cert. denied*, 532 U.S. 937 (2001). Defendant was sentenced to 115 months; this sentence falls within the statutory limits under 18 U.S.C. § 1014 and 1029(a). Thus, there is no error and *Apprendi* does not apply. See *Kinter*, 235 F.3d at 201-202.[9]

### E.

Defendant also challenges the district court's determination of three sentencing guideline applications. We review the district court's factual determinations concerning the application of the Sentencing Guidelines for clear error and legal conclusions *de novo*. *United States v. Blake*, 81 F.3d 498, 503 (4th Cir. 1996). The government bears the burden of showing that a guideline enhancement applies, while the defendant has the burden of proving by a preponderance of

---

[9] Sarno's claim is that the adjustments for amount of loss, more than minimal planning and defrauding, more than one victim, mass marketing, and abuse of trust may not be used in sentencing unless "alleged in the indictment and proven beyond a reasonable doubt," Br. p.61. We do not agree.

the evidence mitigating factors that would lower his ultimate sentencing range. *United States v. Urrego-Linares*, 879 F.2d 1234, 1236-39 (4th Cir.), *cert. denied*, 493 U.S. 943 (1989).

1.

First, defendant contests the district court's mass-marketing enhancement. U.S.S.G. § 2f1.1(b)(3) provides that an offense committed through mass-marketing allows for a two level increase. The district court determined that defendant had used mass-marketing to commit his offenses.

Application Note 3 defines mass-marketing as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons . . . (C) to invest for financial profit." Unfortunately, case law on this provision and application note is sparse.

While the government bears the burden of proving enhancements, the district court may accept the PSR as its findings of fact. If so, the defendant must then show that the PSR is incorrect or unreliable. *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). The district court adopted the findings of fact in the PSR, concluding that the web page flyers "were passed out with, obviously, the intent to make inquirers, and people who might show interest, to believe that it [the company] was global."[10] While defendant disagreed as to whether the flyers containing the web page information were actually passed out, he presented no rebuttal evidence to these factual contentions at his sentencing hearing. With no contradictory evidence, we cannot say that the district court clearly erred in adopting the factual findings in the PSR. As to defendant's argument that the 13 people he defrauded do not equate to a "large number of people," the provision states "a campaign conducted . . . to *induce* a large number of people." The provision does not state that a large number of people must actually be defrauded by the mass-marketed fraudulent actions. U.S.S.G. § 2F1.1(b)(3) Application Note 3 (emphasis added). As found by the district court, the defendant conducted a campaign designed to induce

---

[10] The web page was never launched.

11

a large number of people to invest; fortunately, however, no more than 13 were defrauded. For these reasons, we affirm the mass-marketing two-point enhancement.[11]

### 2.

Second, defendant contests the district court's enhancement for abuse of trust. U.S.S.G. § 3B1.3 provides that"[i]f a defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, an increase by two levels." Application Note 1 defines a trust position as "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)."

The abuse of trust issue is viewed from the victims' perspective. *United States v. Akinoye*, 185 F.3d 192, 203 (4th Cir. 1999), *cert. denied*, 528 U.S. 1177 (2000). Defendant argues that since the investors knew of his past criminal history, they did not place him in a position of trust.

We find no error and affirm the district court's two point enhancement for abuse of trust. We do so for two reasons. First, assuming defendant's argument is correct, we question whether all of the investors knew of defendant's past criminal history. Camille Roberts testified, "I never did once know that he was already in trouble for a federal violation previous or I would not never have invested in him." Second, defendant held himself out as the sole proprietor of an invented firm which, in this case, illustrated "professional or managerial discretion" under U.S.S.G. § 3B1.3 Application Note one.

### 3.

Third, defendant challenges the district court's denial of his acceptance of responsibility claim under Guidelines § 3E1.1 as a mitigating sentencing factor. The defendant contends that he fully accepted responsibility through papers filed on October 3, 1999. The district

---

[11] We do *not* hold that 13 is *not* a large number of people.

12

court originally granted a two, out of three, point reduction for acceptance of responsibility, noting that it was an "extremely close call." Defendant then, however, filed a motion to withdraw his guilty pleas, but later argued that this motion did not warrant a reversal of the district court's two point reduction for acceptance of responsibility. He claimed to be only challenging his legal, not factual, guilt. Defendant, however, rewrote his factual version of the PSR, with the understanding that the district court would revisit all of its previous guideline findings. In addition, a witness testified that defendant, less than a week earlier, had assured him his money would be returned, which never occurred. From these facts and transcripts from the hearing, we find no error in the district court's denial of an acceptance of responsibility credit.

### III.

In conclusion, we affirm the district court's denial of defendant's motions to withdraw his guilty plea, to have the district court recuse itself, and to undergo a psychiatric evaluation. We find no merit to defendant's *Apprendi* argument. We also affirm the district court's sentencing guideline applications.

*AFFIRMED*

13